## Sadler's Appeal.

1. Where a trust estate is conveyed to a volunteer he is bound by the trust, although he had no notice of it, and if the grantee of such an estate, for full value, have notice of the trust, he is bound just as the grantor is bound.

2. If property in its original state and form is covered with a trust in favor of the principal, no change in that state and form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right (not being bona fide purchasers for a valuable consideration without notice), any more valuable claim in respect to it than they respectively had before such change, and in accordance with this principle equity will follow a trust fund through every transmutation for the benefit of the *cestui que trust.*

May 14th 1878. Before AGNEW, C. J., MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ. SHARSWOOD, J., absent.

Appeal from the Court of Common Pleas of *Cumberland county:* Of May Term 1878, No. 190.

Appeal of W. F. Sadler, receiver of the First National Bank of Carlisle, Pa., from the decree of the court confirming the report of the auditor, to whom was referred the account of Jesse Hettrick and Charles Hepburn, trustees.

The First National Bank of Carlisle was a corporation chartered under the National Bank Act of February 25th 1863.

Hon. Samuel Hepburn was president of the bank, and his son, C. H. Hepburn, cashier.

The capital stock was divided into five hundred shares. Of these, four hundred and sixty shares were owned by Judge Hepburn.

The bank suspended payment on 1st of October 1873. A receiver was appointed on 25th of same month, into whose charge the assets of the bank passed. The president of the bank was its debtor to a considerable amount.

On September 30th 1873, the books of the bank show and the cashier testifies that certain items of indebtedness were charged off, for which Judge Hepburn was liable, amounting to $16,400, and some other matters, aggregating $24,500, and that on that day there was substituted the item "Mortgage, S. Hepburn—$24,500." That this item was made up of a mortgage, by Samuel Hepburn, on a farm in South Middleton township, to Jesse Hettrick and D. W. Worst, to secure transient deposits which they had in said bank to the amount of about $6000, and also a trust mortgage to C. H. Hepburn and Jesse Hettrick of another farm "in trust to secure the depositors of the First National Bank." This farm was valued

at about $20,000. These mortgages were executed on October 1st 1873, and the entry in the bank books was made in contemplation of their execution. They were entered as assets of the bank on its books and turned over to the receiver as such by the cashier of the bank, who was one of the trustees in the trust mortgage.

Samuel Hepburn made an assignment for the benefit of creditors on the 21st day of October 1873.

A bill in equity having been filed, by certain depositors of the First National Bank, against the trustees in the mortgage, praying for a sale of the mortgaged premises, the court decreed a sale thereof.

The sale of the farm was made. The trustees filed an account, exceptions were filed to the same, and the matter referred to an auditor to pass upon exceptions and make distribution.

At the time of the failure of the bank, its creditors consisted of the following classes:

1. Depositors payable on demand without interest.

2. Depositors payable on twenty days' notice, with interest, on condition deposit should remain a certain time.

3. Balances due banks.

4. Collections for banks and individuals, with which no account was kept.

It was contended by the second class of creditors that, under the terms of the deed, they alone should participate in the fund.

By the first class, that all depositors not bailors were included in the mortgage.

By the third and fourth classes, that " balances due banks" and " collections," were in fact deposits, and by the receiver of the bank that the whole fund should be treated as assets of the bank, and should be distributed rateably to all its creditors; that the trust mortgage was a mere substitute for other assets of the bank; that it was so carried on its books; so regarded at time of bank's suspension, and so turned over to the receiver. The auditor held that the fund should go to the depositors of the bank, among whom he included the first and second above-described classes of creditors, excluding all the others. The court, Herman, P. J., confirmed this report, and from that decree this appeal was taken.

*A. B. Sharpe, J. H. Graham, H. Newsham, Duncan M. Graham, John Hays, F. E. Beltzhoover, S. M. Leidich* and *W. F. Sadler*, for appellant.—Equity will follow a trust fund through every mutation for the benefit of the *cestui que trust:* Kirkpatrick *v.* McDonald, 1 Jones 393; Pierce *v.* McKeehan, 3 W. & S. 280; Harrisburg Bank *v.* Tyler, 3 Id. 373; Beck *v.* Urich, 1 Harris 638; Hill on Trustees, 2d Am. ed. 142; Lawrence's Appeal, 2 Norris 493. A resulting trust in favor of all the creditors of the bank arose by virtue of the circumstances of the transaction itself: Morey

*v.* Herrick, 6 Harris 129. The capital stock of an incorporated bank is a trust fund for all the debts of the corporation : 2 Story's Equity Jur., sect. 1252 ; Mumma *v.* The Potomac Co., 8 Pet. 281 ; Where a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held, in its new form, liable to the rights of the original owner, or *cestui que trust:* 1 Story's Equity Jur., sect. 1258; Reed's Appeal, 10 Casey 208 ; Stockdale *v.* Ullery, 1 Wright 486. If an estate in trust is conveyed to a volunteer, he will be bound by the trust : Coble *v.* Nonemaker, 28 P. F. Smith 501 ; Lewin on Trusts 205; Mansell *v.* Mansell, 2 Peere Wms. 678.

*John R. Miller, S. Hepburn, Jr.,* and *.L. Todd,* for appellees. —The capital stock of a corporation is clothed with a trust only in the sense that it cannot be diverted generally from its creditors : Story's Equity Jur., sect. 1252. And the indebtedness of stock-holders, otherwise than on subscriptions to stock, is not a trust fund : New Albany *v.* Burke, 11 Wall. 103; Burke *v.* Smith, 16 Id. 395. The debt of a stockholder (not *quoad* stockholder) ceases to be "the trust fund to which creditors can look, and becomes ordinary assets with which the directors may deal as they choose :" Sawyer *v.* Hoag, 17 Wall. 621. In any event the trust which affects the assets of a corporation, other than unpaid instalments of stock, is not one which precludes the preference of some creditors over others : New Albany *v.* Burke, 11 Wall. 103; Scammon *v.* Kimball, 2 Otto 369; Curran *v.* State of Arkansas, 15 How. 307. The notes and bonds of S. Hepburn were not for unpaid subscriptions of stock. The use of them for preferring certain creditors was not therefore a breach of trust.

Mr. Justice WOODWARD delivered the opinion of the court, June 25th 1878.

Among the facts reported by the auditor it was found that "there is no reason to doubt that the First National Bank of ·Carlisle, at the time when the mortgagor in the deed to Hettrick and Hepburn was the president, and C. H. Hepburn, one of the trustees, was the cashier, did receive the mortgage as a portion of their assets, and so entered it in their schedule of assets, and surrendered for it notes and bonds which had previously belonged to them." The exact character of the notes and bonds surrendered was not described, either in the testimony or in the report. They amounted to $16,400, and were marked paid and given up to Judge Hepburn when the deed of trust was delivered. Charles H. Hepburn testified that the judge "was largely indebted to the bank, and had been for some time ; that 'the bank held his notes,' and that 'some of these were surrendered to the amount of———.'" It has not been shown that the notes and bonds given up represented an

indebtedness of Judge Hepburn amounting to $16,400. But the fact may perhaps be implied from the fact that, contemporaneously with the execution of the deed, he received them, and they were cancelled. At the time when the exchange of securities was made, the item, "Mortgage, S. Hepburn, $24,500," was entered on the books of the bank, and, in the words of Charles H. Hepburn, "was carried as assets, and went into the hands of the receiver when the bank closed." There was some discrepancy in the explanations made of the materials of which this item of $24,500 was made up. In the last examination of the cashier, he said it was composed of the $16,400 of securities extinguished, and of some items of loss charged off. The finding of the auditor was in accordance with this statement of the fact. If the sum was produced in that way, the losses included in it amounted to $8100. But when he was first called, the cashier said that "the trust-deed, as well as a mortgage on the Foulk farm to Jesse Hettrick and D. W. Worst, to secure debts of theirs against the bank, was carried on the books under the head of 'Mortgage, S. Hepburn, $24,500.'" The Foulk farm mortgage was for $6000, and if the new entry on the books covered that sum, the amount charged off for losses would be reduced to $2100. As, however, the fund for distribution is only $16,057.86, this discrepancy is not regarded as important. There is no money in excess of the amount of the cancelled notes and bonds, for which the depositors can set up an equitable claim based on the provision made by Judge Hepburn for their benefit to secure worthless debts.

In deciding the questions submitted to him, the auditor treated the deed of trust as a security for none other than the claims of depositors in the bank, and the fund in the hands of the trustees was divided among two classes of such depositors. The first class was composed of those who held certificates for deposits payable with interest on twenty days' notice of demand; and the second, of those whose deposits did not bear interest, which were subject to check, and for which, when received, certificates or credit in pass-books were given. The former usage of the bank had recognised an intermediate class of depositors, who received certificates, on the return of which they were entitled to payment without interest. At the date of the trust-deed, and at the date of the audit, no certificates of this character were outstanding.

In its terms the trust-deed was undoubtedly a provision for the benefit of the depositors. The land described in it was conveyed "in trust to secure" them for "the amounts due and becoming due upon their respective certificates of deposit." The consideration was declared to be "for the better securing the said certificates of deposit, with their interest." The trustees were to hold the land "as security for the payment of the deposits yet unpaid in the First National Bank of Carlisle." And upon the payment by

Judge Hepburn of "all the deposits yet unpaid on or before the first day of October 1874," the conveyance and the estate granted by it were to become void. If this controversy were to be determined by the terms of the instrument itself, without inquiring into and considering connected and surrounding facts, nothing would be required beyond a simple approval of the decision of the auditor.

But the deed by which the trust was created, passed into the possession of the bank. It took its place among the general assets of the corporation to fill the room which the withdrawal and cancellation of other general assets had made vacant. The consideration for its execution had proceeded from the bank, and had consisted of the notes and bonds that had been surrendered. These notes and bonds had formed part of the securities held by the corporation as a trust for the general creditors. In transferring them, and in accepting the trust deed in their stead, it was not in the power of the officers of the bank to impair existing rights by attempting to make exclusive provision for a new or narrowed class of beneficiaries. No consideration was paid by the depositors entitling them to preference, and the trustees were volunteers. The fund in court was made up of the proceeds of the land conveyed by the deed, and the direct connection between the deed and the cancelled securities has been established by the testimony and the auditor's report. The absolute identity of the fund as the product of the notes and bonds that were given up is not contested. By what rule, then, can the diversion from the general creditors of assets belonging to them to the depositors be justified? It is well settled that if an estate in trust be conveyed to a volunteer, he will be bound by the trust, although he had no notice of it. If the grantee of such an estate for full value have notice of the trust, he is bound just as the grantor is bound. A trust already in existence and annexed to the present subject-matter, is created *de novo* as against a person who takes by a title derivative from the original trustee: Lewin on Trusts 205, 206; Mansell *v.* Mansell, 2 Peere Williams 678, 681; Coble *v.* Nonemaker, 28 P. F. Smith 501. The general proposition, which is maintained both at law and in equity on this subject, is, that if any property in its original state and form is covered with a trust in favor of the principal, no change in that state and form can divest it of such trust, or give the agent or trustee converting it, or those who represent him in right (not being bona fide purchasers for a valuable consideration without notice), any more valuable claim in respect to it than they respectively had before such change: 2 Story's Equity, sect. 1258. The same proposition is variously illustrated in the same book, in sects. 1252, 1257 and 1268. In accordance with this principle, it has been ruled that equity will follow a trust fund through every transmutation for the benefit of the *cestui que trust:* Kirkpatrick *v.* McDonald, 1 Jones 391. The conversion of trust money or *choses in action* into land is not per-

[Sadler's Appeal.]

mitted to divest its fiduciary character, and a court of chancery will pursue it wherever it can be identified and traced: Philips *v.* Crammond, 2 W. C. C. R. 441; Pierce *v.* McKeehan, 3 W. & S. 280; Le Neve *v.* Le Neve, Amb. 436. The general creditors of the First National Bank of Carlisle were entitled to participate in the distribution of this fund, and the exceptions to the auditor's report filed by Mr. Sadler, the receiver, ought to have been sustained.

> The decree is reversed at the costs of the appellees, and it is ordered that the record be remitted, that the distribution made by the auditor may be amended and corrected.